IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DINE CITIZENS AGAINST RUINING OUR
ENVIRONMENT, SAN JUAN CITIZENS
ALLIANCE,

             Plaintiffs,

v.                                            **08cv0350 JCH/RHS**

OMAR BRADLEY, in his Official Capacity
as Navajo Regional Director, Bureau of Indian
Affairs, BUREAU OF INDIAN AFFAIRS,
UNITED STATES DEPARTMENT OF INTERIOR,

             Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiffs' *Amended Cross Motion for Summary Judgment* [Doc. 83] and Defendant United States' *Motion for Summary Judgment* [Doc. 85]. The parties' cross motions for summary judgment reference three separate requests filed by Plaintiffs under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq*. In an Order dated May 17, 2010 [Doc. 95], the Court granted Defendant additional time to submit supplementary materials in support of its motion for summary judgment, and Defendant submitted those additional materials on June 16, 2010. *See* Doc. 96. The Court, having carefully considered all of the briefing and the law, having reviewed the voluminous exhibits, and being otherwise fully informed, finds that Plaintiffs' motion is not well-taken and should be denied and that Defendant's motion is well-taken and should be granted.

## BACKGROUND

This case arises from three separate FOIA requests filed by Plaintiffs.  Plaintiffs filed each FOIA request with the Bureau of Indian Affairs ("BIA"), a federal agency within the United States Department of Interior ("DOI").[1]  Two of the FOIA claims sought certain records related to the Desert Rock Energy Project, a proposed 1,500 megawatt coal-fired power plant on Navajo Nation lands in northwestern New Mexico.  The third claim sought records related to the BHP Navajo Mine ("BHP"), a coal mine also located within the Navajo Nation that is expected to provide coal for the Desert Rock power plant.

At the time Plaintiffs filed their FOIA requests and their Complaint in this case, the Desert Rock Energy Project was the subject of a Draft Environmental Impact Statement ("DEIS"), which is a statement prepared in compliance with the National Environmental Policy Act ("NEPA") to analyze and disclose environmental impacts that could occur with the implementation of the proposed project.  The BIA is the lead federal agency responsible for the development of the DEIS.  The proposed project has three primary proponents: Dine Power Authority ("DPA"), a tribally-owned enterprise of the Navajo Nation; Desert Rock Energy Company LLC, a subsidiary of Sithe Global Power LLC; and BHP Navajo Coal Company.  The URS Corporation is a contractor tasked with helping to prepare drafts of the DEIS.[2]  The URS Corporation writes preliminary drafts of the DEIS and submits them to the BIA, Sithe Global, DPA, and BHP for review and comment.

---

[1] Because the Bureau of Indian Affairs and Department of Interior are federal agencies of the United States, for ease of reference, the Court simply refers to the United States as "Defendant."

[2] Whether the URS Corporation is under the control of the BIA is a primary issue in this litigation.

A.  The Desert Rock FOIA Claim

On August 22, 2007, Plaintiffs filed a request referred to throughout the briefing as

"Claim A" or as the "Desert Rock FOIA."  This request sought all records regarding the DEIS

from the following categories:

1. Any and all communications between Sithe Global LLC/Desert Rock Energy
Company LLC and URS Corporation and its subcontractors (including
Ecosphere Environmental Services);
2. Any all communications between Diné Power Authority ("DPA") and URS
Corporation and its subcontractors (including Ecosphere Environmental
Services);
3. Any all communications between Bracewell & Giuliani LLP, including but
not limited to communications with Frank Maisano, and URS Corporation and
its subcontractors (including Ecosphere Environmental Services);
4. Any and all agreements or contracts between the Bureau of Indian Affairs
("BIA") and URS Corporation;
5. Any and all agreements or contracts between Sithe Global LLC/Desert Rock
Energy Company LLC and URS Corporation; and
6. Any and all communication protocols or memorandums of understanding
between BIA and URS Corporation regarding communications with Sithe Global
LLC/Desert Rock Energy Company LLC, DPA or any other party.

Stipulated Exhibits ("Stip. Ex.") at 2-3.

On October 5, 2007, the BIA responded to Plaintiffs' FOIA request, stating that it did not

identify any documents as responsive to the request.  In conjunction with this denial of

Plaintiffs' FOIA request, DOI voluntarily provided a draft work plan describing communication

and documentation arrangements for the DEIS. *See* Stip. Ex. at 7-11.  Plaintiffs filed a timely

appeal of the BIA's October 5, 2007 response.  Due to the instant litigation, which supersedes an

administrative appeal, the DOI closed the file on the appeal without making a ruling.  *See* Stip.

Ex. at 1478.

B.  The Desert Rock Water FOIA

On July 18, 2007, Plaintiffs filed a request referred to throughout the briefing as "Claim

B" or as the "Desert Rock Water FOIA."  The request sought:

> [A]ll agency records created or obtained by the [BIA] regarding the Proposed
> Desert Rock Energy Project that meet the following description:
>
> 1.  Any and all agreements (including leases) in final or draft form between the Navajo
> Nation, Dine Power Authority and/or Desert Rock Energy Company LLC and related to the use
> of waters of the Navajo Nation;
> 2.  Any and all records related to "alternate sources of water" that are "available and
> could be convey [sic] to the site, if needed" as referenced in the Draft Environmental Impact
> Statement ("DEIS") at 4-43.

Stip. Ex. at 1359.

In response to this request, in a letter dated September 18, 2007, the BIA identified three

responsive records concerning the first category of requested records:

> 1.  The Large Water User Master Agreement ("LWUMA") between the Navajo Nation and
> DPA;
> 2.  A lease from the Navajo Nation to DPA for the Desert Rock Energy Project; and
> 3.  A sublease from DPA to Desert Rock Energy Company, LLC.

*Id*. at 1364.

The BIA's September 18, 2007 letter partially released the LWUMA, while redacting

several pages pursuant to FOIA Exemption 4, as codified at 5 U.S.C. § 552(b)(4).  It withheld in

their entirety the lease and sublease, also pursuant to FOIA Exemption 4.  FOIA provides

exemptions for release of records that constitute "[t]rade secrets and commercial or financial

information received from a person which is privileged and confidential."  5 U.S.C. § 552(b)(4).

According to the BIA's FOIA response, the information redacted from the LWUMA "pertains to

commercial and financial information" and specifically "pertains to water, types of water use,

payment, and price adjustment factors for water cost, terms, and termination factors."  Stip. Ex.

at 1364.  Plaintiffs filed a timely appeal of the BIA's September 18, 2007 response.  Due to the

instant litigation, which supersedes an administrative appeal, the DOI closed the file on the

appeal without making a ruling.  *See id.* at 1429.

      C.      Navajo Coal Mine FOIA

On May 3, 2007, Plaintiffs filed a request referred to throughout the briefing as "Claim

C" or as the "Navajo Coal Mine FOIA."  The request sought the following categories of agency

records created or obtained by the BIA and related to BHP's Navajo Coal Mine and related lease

area:

      1. All records of communications between the BIA and Navajo Nation tribal members residing or grazing livestock in the BHP lease area;
      2. All records of communications between BHP and Navajo Nation tribal members residing or grazing livestock in the BHP lease area;
      3. All records of communications between the Navajo Nation and Navajo Nation tribal members residing or grazing livestock in the BHP lease area;
      4. All records of communications regarding Navajo Nation tribal members residing or grazing livestock in the BHP lease area including, but not limited to, communications between BIA, BHP, the Navajo Nation or the Office of Surface Mining;
      5. Any and all lists of Navajo Nation tribal members within the BHP lease area including, but not limited to, lists of tribal members in Navajo Mine areas 4 and 5;
      6. Any and all lists of Navajo Nation tribal members grazing livestock within the BHP lease area including, but not limited to, lists of tribal members grazing in Navajo Mine areas 4 and 5;
      7. Any and all maps or other records which show the location of Navajo Nation tribal members or tribal members grazing livestock;
      8. Any and all records dealing with removal or relocation of Navajo Nation tribal members from the BHP lease area;
      9. Any and all records dealing with compensation to Navajo Nation tribal members in the BHP lease area;
      10. Any and all National Environmental Policy Act ("NEPA") documentation of the impacts to Navajo Nation tribal members in the BHP lease area;
      11. All public notices provided to Navajo Nation tribal members in the BHP lease area; and,
      12. Any and all other records discussing or dealing with Navajo Nation tribal members in the BHP lease area.

Stip. Ex. at 1431-1432.

The FOIA request included a request for a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii)

on the grounds that disclosure of the information is likely to contribute significantly to the public

understanding of the operations or activities of the government and is not primarily in Plaintiffs' commercial interest.  *See* Stip. Ex. at 1434.  On May 18, 2007, Defendant denied Plaintiffs' request for a fee waiver and requested that Plaintiffs first pay a fee of $1,810.00 before it would begin processing the request.  *See id*. at 1437-39.  In its denial, Defendant requested further information from Plaintiffs related to their ability to analyze and synthesize voluminous data and to disseminate such analysis to the general public.  *Id*.  Rather than providing such information, Plaintiff instead appealed the denial of a fee waiver on June 14, 2007.  As with Plaintiffs' other two FOIA appeals, because of the instant litigation, the DOI closed the file on the fee waiver appeal on May 5, 2008 without making a ruling.  *See id*. at 1478.

However, on July 3, 2008, Defendant provided Plaintiffs with an administrative response and release of agency records deemed responsive to the Navajo Coal Mine FOIA.  *See id*. at 1483.  Defendant contends that it provided the materials without charging a fee because Plaintiffs' Complaint in the underlying suit enabled Defendant to narrow substantially the scope of information requested, so that it was no longer so burdensome.[3]  *See id*. at 1481.  In the documents that it provided, Defendant redacted the Navajo Nation census numbers and home addresses of individuals referenced in the documents, pursuant to FOIA Exemption 6, 5 U.S.C. § 552(b)(6).  In this litigation, Plaintiffs contend that Defendant improperly denied their fee waiver request and that its document production in response to their FOIA request was inadequate, but it does not challenge Defendant's redactions.  *See* Plaintiffs' Response to Defendant's Motion for

---

[3] Plaintiffs contend that Defendant's release of information without requiring payment of a fee is an admission on Defendant's part that they qualify for a fee waiver.  Defendant contends that its provision of documents is not an acknowledgment that its initial denial of a fee waiver was in error, but rather is only due to the significant limitation of the request's scope as framed by Plaintiff's Complaint.

6

Summary Judgment [Doc. 89] at 21 n.14.

## LEGAL STANDARD

Summary judgment should be granted if there is "no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Summary judgment is the preferred method of resolving cases brought under FOIA." *Evans v. United States Office of Personnel Mgmt.*, 276 F. Supp. 2d 34, 37 (D.D.C. 2003) (citing *Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993)). When a challenge is made to an agency's decision not to disclose information, the reviewing court must determine the matter *de novo*. *See* 5 U.S.C. § 552(a)(4)(B); *Herrick v. Garvey*, 298 F.3d 1184, 1189 (10th Cir. 2002).

FOIA's core purpose is to shed light on governmental operations and activity. *See Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). The statute is designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). Such a statute is needed "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 941 (10th Cir. 1990) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 241 (1978)). As such, FOIA evinces "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *EPA v. Mink*, 410 U.S. 73, 79-80 (1973). Thus, FOIA's statutory exemptions are narrowly construed with all doubts resolved in favor of disclosure, and an agency resisting the release of documents bears the burden of justifying nondisclosure. *See Anderson*, 907 F.2d at 941.

7

## ANALYSIS

A.  Desert Rock FOIA Request

On August 22, 2007, Plaintiffs requested from the BIA documents generated by URS Corporation and its subcontractors, correspondence between URS Corporation and the proponents of the Desert Rock Power Plant, correspondence between URS Corporation and a law firm, agreements and contracts between URS Corporation and Sithe Global LLC, and any agreements, contracts, or communication protocols between the BIA and URS Corporation.  The BIA did not identify any agency documents as responsive to the request, but later provided a draft work plan describing communication and documentation arrangements for the DEIS, although it made clear that it was releasing the document voluntarily rather than because it considered release to be compelled by the FOIA request.  Plaintiffs contend that Defendant failed to conduct a search that was reasonably calculated to uncover all relevant requested documents.

Plaintiffs' arguments focus less on the thoroughness of Defendant's search of its own records, and more on its contention that Defendant was obligated to have URS search its records and produce any responsive documents contained therein.  Specifically, in its appeal of Defendant's initial determination that it had no responsive records, Plaintiffs' contended that Defendant's search was deficient because it failed to request "records from the BIA's consulting firms, URS Corporation *et al.*" and that communications between URS and the project's proponents constitute "agency records" subject to FOIA.  Stip. Ex. at 16.

In order to be considered an "agency record" subject to a FOIA request, a record must be one that is: (1) created or obtained by an agency, and (2) under agency control at the time of the FOIA request.  *See United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989).

In responding to Plaintiffs' appeal by providing its rationale for why it was denying the FOIA request for documents and correspondence between URS Corporation and other private entities, Defendant contended that: (1) URS is not a government agency; (2) the United States has no control over nor substantial supervision of URS; (3) the United States has no control over nor substantial supervision of other private entities with whom URS was interacting on the project; and (4) documents in the possession of URS and other private entities are not in the possession of the agency.  Stip. Ex. at 43-45.  For purposes of the Court's analysis, the burden is on the agency to demonstrate that the withheld materials are not "agency records," rather than the burden being on the requester to demonstrate  that the materials sought are agency records.  *See Tax Analysts*, 492 U.S. at 142 n.3.

Under 5 U.S.C. § 552(f)(1), an "agency" is defined as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government..., or any independent regulatory agency."  In determining whether a private organization has "agency" status under FOIA, courts have adopted a functional test, looking at factors such as "whether the organization has the authority in law to perform the decisionmaking functions of a federal agency and whether its organizational structure and daily operations are subject to substantial federal control."  *CIBA-GIEGY Corp. v. Mathews*, 428 F. Supp. 523, 527 (S.D.N.Y. 1977), *aff'd sub nom. Forsham v. Califano*, 587 F.2d 1128 (D.C. Cir. 1978), *aff'd sub nom. Forsham v. Harris*, 445 U.S. 169 (1980).  Before characterizing a private entity as a federal agency for FOIA purposes, the Supreme Court requires "a threshold showing of substantial federal supervision of the private activities, and not just the exercise of regulatory authority necessary to assure compliance with

the goals of the federal grant," because merely receiving federal funds[4] does not "serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision." *Forsham*, 445 U.S. at 179.

In addition to contending that URS Corporation is not an "agency" for FOIA purposes, Defendant also contends that documents created and controlled by URS and other private entities are not "agency records."  In order to be an "agency record," a record must be not only have been created or obtained by an agency, but it must also be under agency control at the time of the FOIA request.  *See Tax Analysts*, 492 U.S. at 144-45.  FOIA applies only "to records which have been in fact obtained, and not to records which merely could have been obtained." *Id*. at 144. Under current law, not in effect at the time of Plaintiff's FOIA request, any information that would be considered an "agency record" subject to FOIA if it was  maintained by an agency is also considered an "agency record" if it "is maintained for an agency by an entity under Government contract, for the purpose of records management." *Id*. § 552(f)(2)(B).[5]

In determining whether an agency exercises sufficient control over materials to render them "agency records," even if they are maintained by a private entity, the Court looks to: "(1)

---

[4] There is no evidence before the Court that URS Corporation received any payment from the BIA, as opposed to being paid by the project's proponents.  Even if it had been paid by the BIA, however, the BIA's control over its activities was not sufficient to require its characterization as an "agency."

[5] The definition of "record" to include those records held by a private entity under government contract on behalf of an agency and for the purpose of records management did not become effective until December 31, 2007, well after the date of Plaintiffs' August 22, 2007 FOIA request.  Nonetheless, in anticipation of a potential future FOIA request based on the changed definition, the BIA, with URS Corporation's cooperation, made a voluntary release of 302 documents held by URS on January 25, 2008 that it identified as part of a potential BIA Administrative Record.  *See* Declaration of Thomas Martin, attached as Ex. 2 to Doc. 86, at ¶ 13-14.  The BIA made this voluntary release despite not considering the change in law as applying to this set of documents held solely by URS.  *See id*. at ¶ 14.

the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files." *Burka v. United States HHS*, 87 F.3d 508, 515 (D.C. Cir. 1996).

Through its exhibits and declarations, Defendant has sufficiently demonstrated that the records sought by Plaintiffs were neither created or obtained by a government agency nor under control of a government agency at the time of the FOIA request. Defendant submitted a declaration from Harrilene Yazzie, an Environmental Protection Specialist with the BIA, who served as the Regional NEPA Coordinator for the BIA's Navajo Regional Office and who was centrally involved in searching for responsive documents and determinations of applicable exemptions related to the August 22, 2007 FOIA request. *See* Declaration of Harrilene Yazzi (hereinafter "Yazzi Dec."), attached as Ex. 1 to Doc. 86, at ¶¶ 1-4. In addition, it submitted the declaration of Thomas Martin, the Regional FOIA Coordinator for the BIA's Navajo Regional Office, who was also centrally involved in searching for responsive documents and determinations of applicable exemptions related to the August 22, 2007 FOIA request. *See* Declaration of Thomas Martin (hereinafter "Martin Dec."), attached as Ex. 2 to Doc. 86, at ¶¶ 1-4. As discussed below, Defendant's declarations are not simply conclusory, but rather are quite specific when discussing the documents at issue and the reasons for withholding them, and they are not called into doubt by contradictory evidence or evidence of bad faith. Thus, they are sufficient to sustain Defendant's burden.

For purposes of analysis, the Court will look at items requested in paragraphs 1, 2, 3, and 5 separately from the items requested in paragraphs 4 and 6, because the items requested in

paragraphs 1, 2, 3, and 5 concern private communications among non-governmental entities, whereas those requested in paragraphs 4 and 6 concern agreements between the BIA and URS. *See* Stip. Ex. at 2-3. As detailed by Ms. Yazzi's declaration and the *Vaughn* index,[6] a thorough search of BIA's records revealed no documents responsive to requests in paragraphs 1, 2, 3, and 5. *See* Yazzi Dec. at ¶¶ 9-11, 13; Stip. Ex. at 1563-65. Mr. Martin, the Regional FOIA Coordinator, determined that the requested private communications between the project's proponents, URS, and its subcontractors were not subject to FOIA because they were not generated by, nor in the possession or control of the BIA, and were therefore not agency records. *See* Martin Dec. at ¶ 12. Defendant provided a detailed explanation of the basis for this decision in its January 25, 2008 response to Plaintiffs' November 2, 2007 appeal. *See* Stip. Ex. at 40-48.

Defendant explained that the BIA had not entered into any contractual agreement with URS or any other firm identified in Plaintiffs' requests, and that any contractual relationship existing between URS and any project proponent or outside expert was outside of the BIA's purview. *See id*. at 43. Defendant explained that the BIA selected URS from among those consulting firms proposed by the project proponents to conduct surveys and to support the production of the DEIS, but that URS is under contract to, and paid by, the project's proponents rather than the BIA. *See id*. Plaintiffs do not appear to contest this explanation as they have stipulated that "URS is not a government agency," that "[no] written agreement establishes consultant or contractual relationships between the BIA, URS, its subcontractors and other private entities identified by [P]laintiffs," and that "[the] BIA has no written contract-based,

---

[6] So named for *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), which first suggested the necessity of an index listing each withheld document and the asserted reason for its nondisclosure.

retained-consultant relationship with URS, its subcontractors and other private entities identified by [P]laintiffs." *See* Joint Stipulation of Facts [Doc. 31] at ¶¶ 1, 3, and 4. Because, as explained by Defendants and conceded by Plaintiffs, no contractual relationship exists between the BIA and URS, the only way in which private communications between URS and its subcontractors and project proponents could be considered "agency records" subject to FOIA would be if URS had "agency" status.[7]

As previously discussed, in determining whether a private organization has "agency" status for FOIA purposes, courts look at whether a governmental agency has the requisite constructive control over the private organization, including whether the private organization has been delegated the authority to perform the decisionmaking functions of the federal agency and whether the private organization's day-to-day operations are subject to substantial federal control. *See Forsham v. Harris*, 445 U.S. 169, 179 (1980); *CIBA-GIEGY Corp. v. Mathews*, 428 F. Supp. 523, 527 (S.D.N.Y. 1977). Plaintiffs have stipulated that neither URS, its subcontractors, nor any other private entities identified by Plaintiffs in their FOIA request have been delegated the decision-making authority of the BIA. *See* Joint Stipulations [Doc. 31] at ¶ 2. Instead, Plaintiffs contend that the BIA exercises extensive control over URS in its role as a supervisor of URS's development of the DEIS.

Plaintiffs point to the fact that the DEIS lists URS as a consultant to the BIA as evidence of the BIA's extensive control over URS. *See* Plaintiffs' Amended Cross Motion for Summary

---

[7] Because no contractual relationship exists between the BIA and URS, the fact that the BIA's search turned up no contract between the BIA and URS, as requested in Plaintiffs' FOIA item 4, and no written agreement between the BIA and URS regarding URS's communications protocols with other private entities, as requested in Plaintiffs' FOIA item 6, is hardly evidence of an inadequate search.

Judgment [Doc. 83] at 17 (citing Ex. 3 to Doc. 83 at 9-10).  Defendant does not deny that URS
serves as a third party consultant on the DEIS, or that URS played a substantial role in the
development of the DEIS.  Indeed, as Defendant explained to Plaintiffs in responding to their
appeal, "[t]he BIA, as the lead agency responsible for carrying out the NEPA requirements for
the proposed federal action, has provided guidance to URS in the development of the draft EIS
and, along with other cooperating federal agencies, has independently evaluated all sections of
the draft EIS prepared by URS."  Stip. Ex. at 44.  Defendant went on to explain that "[a]lthough
the BIA and other cooperating agencies provide on-going guidance and review the products of
URS's research and analytic efforts in the form of draft sections of the draft EIS, the federal
agencies do not exercise day-to-day supervision of URS employees or other private consultants
conducting the underlying studies or analyses."  *Id*.

A federal agency's reliance on a third-party contractor, hired and paid by a project
proponent, to help prepare a report falls far short of an indication that the federal agency controls
the private entity for FOIA purposes.  *See Washington Research Project, Inc. v. Dep't of Health,
Education, and Welfare*, 504 F.2d 238, 247-48 (D.C. Cir. 1974) ("Employing consultants to
improve the quality of the work that is done cannot elevate the consultants to the status of the
agency for which they work unless they become the functional equivalent of the agency, making
decisions for it").  URS writes preliminary drafts of the EIS for submission to BIA, Sithe, DPA,
and BHP for review and comment as they are completed.  *See* Stip. Ex. at 1333 (DEIS
workplan).  The BIA, which takes  full responsibility for the scope and content of the DEIS, has
final approval of each iteration of the DEIS.  *See id*. at 1333-35.  Plaintiffs have submitted no
evidence to indicate that URS makes decisions for the BIA such that it is the functional
equivalent of the agency or that the BIA exercises such control over the day-to day operations of

14

URS that it has turned URS into an equivalent of the agency.  Mere status as a third-party contractor is insufficient to render URS's communications with other private entities subject to FOIA.

Furthermore, in order to be considered an "agency record" subject to a FOIA request, a record must not only be created or obtained by an agency, but also must be under agency control at the time of the FOIA request.  *See Tax Analysts*, 492 U.S. at 144-45.  Plaintiffs point to the fact that URS maintains an Administrative Record for the BIA as evidence that the BIA had constructive control of the requested records.  *See* Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment [Doc. 89] at 9.  This argument similarly misses the mark.  As acknowledged by Defendant, URS maintains certain records as part of a potential Administrative Record for the DEIS on behalf of the BIA.  *See* Doc. 86 at 10 n.5.  Specifically, URS maintains a comprehensive Administrative Record for the BIA that includes incoming and outgoing correspondence, internal and external memoranda, meeting summaries, voice messages and email, records of conversation, site visit reports, and transmittals relevant to the project.  *See* Stip. Ex. at 1339 (Desert Rock EIS Workplan).

Although, at the time of the FOIA request, records held by a contractor were not considered to be agency records,[8] the BIA nonetheless requested that URS review the documents that it maintained to be included in a possible future administrative record to see if any of those documents could be considered responsive to the FOIA request.  *See* Martin Dec. at ¶ 13; Yazzi

---

[8] The expansion of "record" to include information maintained for an agency by an entity under government contract, pursuant to 5 U.S.C. § 552(f)(2)(B) did not take effect until December 31, 2007.  Note that, even after the effective date expanding the definition of record to include information held by government contractors, it is not clear that such a definition would apply to information held by URS, as URS has no contract with BIA and is instead under contract to the project's proponent.

Dec. at ¶ 16; Stip. Ex. at 1564 (*Vaughn* Index).  URS performed this request, even though it was not contractually obligated to do so.  On January 25, 2008, the BIA made a voluntary release of 302 documents that comprised the potential administrative record, and withheld no responsive documents.  *See* Martin Dec. at ¶ 14-15; Yazzi Dec. at ¶ 18-19; Stip. Ex. at 1564.  Because the only records that URS is even arguably obligated to maintain on behalf of the BIA are those intended to become part of a potential administrative record, only those records comprising the potential administrative record could be considered to have been constructively in the possession of BIA, as opposed to all of URS's records.  The BIA turned over those records.

If none of the private correspondence between URS and other private entities, as sought by the FOIA request, was part of the potential administrative record, the BIA would have no ability to demand it or obligation to produce it.  Quite simply, private correspondence and contracts between private entities that are not part of the potential administrative record are neither created by the agency nor in its constructive possession, and are not subject to Plaintiff's FOIA request.  There is no evidence before the Court to indicate that the BIA exercises sufficient control over these private materials to render them "agency records," as it is highly unlikely that it was the intent of the documents' creators to relinquish control over the records, that the BIA could dispose of the records as it sees fit, that the BIA has relied upon the private records in its decision making, or that it has integrated any of the documents into its record system or files. *See Burka v. United States HHS*, 87 F.3d 508, 515 (D.C. Cir. 1996).

Finally, Plaintiffs attempt to use the BIA's voluntary release of documents formerly in the possession of URS against it, by arguing that the BIA failed to provide an adequate description of the search procedures utilized by URS.  Because, as discussed above, the BIA was not obligated to search URS's records for the private correspondence requested by Plaintiffs, it

was not required to detail the search procedures utilized by URS in its voluntary search.

B.  <u>Desert Rock Water FOIA Request</u>

On July 18, 2007, Plaintiffs filed a request seeking agency records associated with the proposed Desert Rock project consisting of: (1) any agreement between the Navajo Nation, DPA, or Desert Rock Energy Company regarding the use of Navajo Nation water, or (2) any records relating to alternate sources of water that could be conveyed to the project site.  *See* Stip. Ex. at 1359.  In response to this request, in a letter dated September 18, 2007, the BIA indicated that it had not identified any responsive records related to the second category of requested documents, but that it had identified three responsive records concerning the first category:

1.  The Large Water User Master Agreement ("LWUMA") between the Navajo Nation and DPA;
2.  A lease from the Navajo Nation to DPA for the Desert Rock Energy Project; and
3.  A sublease from DPA to Desert Rock Energy Company, LLC.

*Id*. at 1364.

The BIA's September 18, 2007 letter partially released the LWUMA, while redacting several pages pursuant to FOIA Exemption 4, as found at 5 U.S.C. § 552(b)(4).  It withheld in their entirety the lease and sublease, also pursuant to FOIA Exemption 4.  FOIA provides exemptions for release of records that constitute "[t]rade secrets and commercial or financial information received from a person which is privileged and confidential."  5 U.S.C. § 552(b)(4).  According to the BIA's FOIA response, information redacted from the LWUMA "pertains to commercial and financial information" and specifically "pertains to water, types of water use, payment, and price adjustment factors for water cost, terms, and termination factors."  Stip. Ex. at 1364.

If the information withheld is not a trade secret, then, for Exemption 4 to apply, the

information must be "(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Anderson v. Health & Human Servs.*, 907 F.2d 936, 944 (10th Cir. 1990).  For FOIA purposes, "person" includes "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2).  Information is considered "confidential" if its disclosure "is likely '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Anderson*, 907 F.2d at 946 (citation omitted).

Plaintiffs challenge Defendant's determination that Exemption 4 applies to the identified documents, and contends that Defendant has failed to supply sufficient information to justify its withholding of information.  As the party withholding the information, the BIA bears the burden of demonstrating that the exemption applies.  *Id*. at 947.  In order to demonstrate that disclosure will "cause substantial harm to the competitive position of the person from whom the information was obtained," the BIA must show "actual competition and the likelihood of substantial competitive injury."  *Utah v. U.S. Dept. of Interior*, 256 F.3d 967, 970 (10th Cir. 2001) (hereinafter "*Utah v. DOI*").  Although actual economic harm need not be proved, and "evidence demonstrating the existence of *potential* economic harm is sufficient," mere "conclusory and generalized allegations of substantial competitive harm...are unacceptable and cannot support an agency's decision to withhold requested documents."  *Id*. (emphasis in original).

According to the BIA's September 18, 2007 FOIA response, the information redacted from the LWUMA "pertains to commercial and financial information" and specifically "pertains to water, types of water use, payment, and price adjustment factors for water cost, terms, and

termination factors." Stip. Ex. at 1364. The Agency's *Vaughn* index, explaining the reason for

redacting or withholding the documents, goes further. It indicates that the Navajo Nation, which

had stamped all three documents "Confidential" when it turned them over to the BIA, objected

to the release of information in the three documents. *See id.* at 1568-69. According to the

*Vaughn* index:

> the Navajo Nation provided examples of current business negotiations and
> realistic prospective lease opportunities that both established the existence of a
> highly competitive market for the resources the Nation has to offer, and
> underscored the potential harm to the Nation's negotiating ability if its business
> strategies, terms, and lease conditions were to become known to its competitors.

*Id.* at 1569.

In addition, the declaration of Thomas Martin addressed this issue. Mr. Martin declared

that the Navajo Nation sent a letter informing the BIA that it considered all information

contained in the three documents to be confidential commercial information that should be

withheld from disclosure pursuant to FOIA Exemption 4, and that release of the documents

could harm the Navajo Nation's ability to negotiate future leases involving its land and water

resources. *See* Martin Dec. at ¶ 20.

The justification for withholding information that Defendant initially provided through

its FOIA response, its *Vaughn* index, and Mr. Martin's declaration merely paraphrased

information provided to it by the entity which claims it would be adversely affected by

disclosure. This stood in stark contrast to *Utah v. DOI*, in which the court was able to rely on

detailed affidavits submitted by the potentially-affected entities in evaluating the propriety of the

Agency's decision to withhold information. *See* 256 F.3d at 970.

*Utah v. DOI* concerned a lease between the Skull Valley Band of Goshute Indians ("the

Band") and Private Fuel Storage, LLC ("PFS") that would allow PFS to store approximately

40,000 tons of spent nuclear fuel on land belonging to the Band.  The State of Utah sought documents, including the lease, pursuant to FOIA.  The BIA provided the State with a redacted copy of the lease, stating that the redacted portions of the lease were exempt from disclosure under FOIA Exemption 4.  In upholding the district court's determination that the BIA properly withheld the information, the Tenth Circuit relied upon affidavits submitted by the Chairman of the Band and by the Chairman of the Board of PFS.  The court characterized the Band's affidavit as identifying the specific manner in which competitors could use the redacted information, describing the Band's competitors, and indicating concerns over future harm because the Band would not be able to offer potential future partners any assurance of confidentiality.  *See id*.  The affidavit from PFS similarly identified potential competitive harm that could come if the information was revealed, including a statement that two competitors of PFS had announced the development of facilities that would compete with PFS and that the disclosure of lease information would give an unfair advantage to competitors because they would know what terms PFS had agreed to and could use this information in future negotiations.  *See id*.  The court found that the affidavits "are legally sufficient to demonstrate that actual competition exists and that disclosure would lead to substantial competitive injury," and that "defendants have met their 'burden of justification by showing that the parties to the Lease have actual competitors and that the parties would suffer harm if the withheld information were released.'"  *Id*. at 971 (citation omitted).

In an abundance of caution, this Court determined that it should have more information from the BIA, of the sort provided in *Utah v. DOI*, before it made its determination of whether the BIA appropriately withheld the information sought by Plaintiffs.  Specifically, the Court sought documentation setting forth the basis on which Defendant concluded that the Navajo

Nation properly claimed that release of the information would likely cause it substantial competitive harm.[9]  The Court granted Defendant an opportunity to provide this additional information for *in camera* review if the BIA believed that release of the basis for its contention could itself cause harm to the Navajo Nation.  *See* Doc. 95.  Defendant provided the information sought by the Court in a supplemental filing on June 16, 2010.  *See* Doc. 96.

Defendant's supplemental filing included a May 28, 2010 Declaration from Arvin Trujillo, the Executive Director of the Division of Natural Resources of the Navajo Nation, and two letters on which Defendant had relied in making its initial determination to withhold the requested information: (1) an August 27, 2007 letter to the BIA from Mr. Trujillo in his same capacity detailing the competitive disadvantages to the Navajo Nation if certain confidential information were to be released; and (2) an August 21, 2007 letter to the BIA from Harrison Tsosie, the Deputy Attorney General for the Navajo Nation's Department of Justice, in which he concludes "it is the Navajo Nation position that the lease, sublease, and Master Water Use Agreements are confidential and should not be disclosed."

After reviewing Defendant's supplemental submission, the Court concludes that Defendant has met its burden of demonstrating that FOIA Exemption 4 applies to the documents in question, and that Defendant was justified in withholding the information sought by Plaintiffs. The declaration and letters attached to the supplemental submission clearly demonstrate the presence of "actual competition and the likelihood of substantial competitive injury" if the information were to be released.  *See Utah v. DOI*, 256 F.3d at 970.  The two letters from Navajo

---

[9] Rather than being limited to a record created by the agency, courts have wide discretion to further develop a record to aid it in its *de novo* review of a FOIA determination.  *See Anderson v. Health & Human Servs.*, 907 F.2d 936, 941-42 (10th Cir. 1990).

Nation representatives reflect their contemporaneous assessment of the competitive environment for access to the Navajo Nation's land and water resources, and the damage that could result if competitors were to obtain the confidential commercial and financial information contained in the three agreements in question.

Mr. Trujillo's letter explains that the Navajo Nation is in direct competition with other entities in New Mexico for the acquisition of water rights, and that competitors for those rights could use geological information from the LWUMA such as well data, water data, supply data, and drilling and geophysical data that are proprietary to the Nation in an effort to bolster their ability to acquire water rights. *See* August 27, 2007 Letter from Arvin Trujillo to BIA, attached as Ex. 2 to Doc. 96, at 3. Mr. Trujillo's letter and Mr. Tsosie's letter both also identify information created or obtained by the Nation that was used in negotiating the lease and sublease that could give an advantage to competing electrical providers, specifically information regarding costs, tax terms, and profit margins. *See id.* at 3-4; August 21, 2007 letter from Harrison Tsosie to BIA, attached as Ex. 3 to Doc. 96, at 1-2. Mr. Trujillo's May 28, 2010 Declaration affirmed the statements made in his earlier letter, and provided additional details concerning the nature of ongoing negotiations involving the Nation that could be impacted by release of the information. *See* May 28, 2010 Declaration of Arvin Trujillo, attached as Ex. 3 to Doc. 96, at 2-6. The Court finds that the Declaration and attached letters "are legally sufficient to demonstrate that actual competition exists and that disclosure would lead to substantial competitive injury," and that Defendant has "met [its] 'burden of justification by showing that the parties to the Lease have actual competitors and that the parties would suffer harm if the withheld information were released.'" *Utah v. DOI*, 256 F.3d at 971 (citation omitted).

Plaintiffs also contend that the BIA's search for records related to alternate sources of

22

water was not reasonably calculated to uncover all relevant documents.  This contention is without merit.  As detailed in the BIA's *Vaughn* Index and Thomas Martin's Declaration, the search for responsive materials covered more than a dozen offices and involved almost 30 officers.  *See* Stip. Ex. at 1570-71; Martin Dec. at ¶ 18.  Plaintiffs complain that the search procedure described in the *Vaughn* Index indicates that no files outside of the BIA's regional and field offices, such as at the BIA's national offices, were searched.  *See* Pl. Resp. [Doc. 89] at 17.  Plaintiffs offer no reason why records related to a local project that were absent from a regional or field office would instead be present at a national office, or why failure to search the national office is an unlawful failure on Defendant's part.  A search must only be reasonable, it need not be exhaustive or of such a scope to uncover "any further documents [that] might conceivably exist." *Trentadue v. FBI*, 572 F.3d 794, 797 (10th Cir. 2009).  The Court concludes that Defendant's search, as documented by the Martin Declaration and *Vaughn* Index, was reasonable.[10]

C.  Navajo Coal Mine FOIA

On May 3, 2007, Plaintiffs filed a FOIA request seeking all agency records created or obtained by the BIA regarding BHP's Navajo Coal Mine and related lease area.  The request detailed twelve separate broad categories of records, including mining records, grazing records, communications with Navajo members living or grazing livestock in the area, and lists of tribal

---

[10] Plaintiffs also contend that Defendant's justification of its search failed to meet its burden because it did not sufficiently specify the procedures used to search filed maintained by URS or other consultants that assisted with the preparation of the DEIS.  For the reasons discussed in the previous section, records held by private organizations are not "agency records" and are therefore not subject to FOIA.  Defendant, with URS's cooperation, voluntarily turned over the records held by URS that comprised the potential Administrative Record.  Defendant did not even arguably have an obligation to search or turn over any other any other privately held records.

members grazing livestock.  *See* Stip. Ex. at 1431-32.  Significantly, the request did not specify a time period for the records sought by Plaintiffs.  Plaintiffs also sought a fee waiver for the records it was seeking on the grounds that it was a non-profit organization and was not seeking the information for a commercial use.

On May 18, 2007, the BIA sent a letter to Plaintiffs explaining that their request had not demonstrated adequately that they had the ability to synthesize the extensive materials being requested and to turn them into a usable product that would inform the public at large, so that it was denying their fee waiver request.  *See* Stip. Ex. at 1438-39.  The letter also suggested that Plaintiffs could reduce the potential fee for the search, estimated to be approximately $1,800, by narrowing the scope of the request or clarifying the type of documents sought, and offered to assist Plaintiffs in narrowing the request.  *See id.* at 1439.  Plaintiffs did not respond to Defendant's offer, and filed the instant suit instead.  However, in filing their Complaint, Plaintiffs clarified and apparently significantly reduced the scope of their initial request.  The Complaint made it clear to Defendant that the Plaintiff sought records beginning in 1995, when the area's coal lease was first assigned to BHP Navajo Coal Company, rather than dating back to 1957, when a coal lease was first issued for the area.  *See* Martin Dec. at ¶ 32; Complaint at ¶ 86 (referring to records "related to BIA policies and activities concerning impacts to Navajo Nation tribal members from BHP's mining and leasing operations for the Navajo Mine").  The Complaint also limited records sought to those impacting tribal members due to BHP coal mining, a further clarification.

With this reduced scope and clarification of information sought, BIA conducted a search

for responsive documents without charge.[11]  This search involved 16 officers in multiple BIA

local and field offices, using both hard copy and electronic record searches.  *See* Martin Dec. at ¶

34; Stip. Ex. at 1577-78 (*Vaughn* Index).  The search uncovered 17 responsive documents, each

of which was released by Defendant.  The only information withheld from the responsive

documents was personal identification information, such as tribal census numbers, telephone

numbers, and addresses of individuals identified in the documents.  *See* Martin Dec. at ¶ 34;

Stip. Ex. at 1579.  These redactions were made pursuant to FOIA Exception 6, which permits an

agency to withhold personal information, especially where there is no apparent public benefit to

its release.  *See* 5 U.S.C. § 552(b)(6).  Plaintiffs have not challenged Defendant's decision to

withhold personal information from the responsive documents.  *See* Plaintiffs' Response to

Defendant's Motion for Summary Judgment [Doc. 89] at 21 n.14.  Instead, Plaintiffs allege that

Defendant's search was inadequate because it did not include files held outside of regional and

field offices, such as national offices.  As previously discussed, a search need only be

reasonable, not exhaustive, to meet FOIA requirements, and there is no indication that further

responsive records would be held at the BIA's national office rather than at its regional and field

offices.  The Court concludes that Defendant's search, as documented by the Martin Declaration

and *Vaughn* Index, was reasonable.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' *Amended Cross Motion for Summary*

---

[11] Because the Court concludes that Defendant's search was reasonable, it need not
address whether Defendant's initial conclusion that Plaintiffs failed to qualify for a fee waiver
was justified.  Plaintiffs have not demonstrated harm from the denial of their initial fee waiver
application, as they do not now contend that they are eligible to receive further records but are
being prevented from doing so by being charged a fee.

*Judgment* [Doc. 83] is DENIED and Defendant United States' *Motion for Summary Judgment*

[Doc. 85] is GRANTED.

**UNITED STATES DISTRICT JUDGE**